UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PRAIRIE BAND POTAWATOMI NATION<br>16281 Q Road<br>Mayetta, Kansas 66509<br><br>       Plaintiff,<br><br>   v.<br><br>STEVEN T. MNUCHIN, in his official capacity<br>as SECRETARY, UNITED STATES<br>DEPARTMENT OF THE TREASURY<br>1500 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20220<br><br>      Defendant. | Case No.:<br><br><br>COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF |

Plaintiff, Prairie Band Potawatomi Nation ("Prairie Band Potawatomi"), a federally recognized sovereign Indian nation, by and through its counsel, states and alleges as follows:

**INTRODUCTION**

1.    The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136, 134 Stat. 281 (2020), was signed into law on March 27, 2020, to provide economic relief for American workers, families, small businesses, and Tribal, state, and local governments impacted by the COVID-19 pandemic.

2.    Pursuant to Title V of the CARES Act, Congress appropriated $8 billion in direct aid to Tribal governments ("Title V Funds").  42 U.S.C. § 801(a)(2)(B).

3.    Congress directed the United States Secretary of Treasury, Steven T. Mnuchin, ("Secretary Mnuchin" and "Treasury"), to consult with Tribal governments and the United States

Secretary of the Interior in order to determine each Tribal government's allocation of the Title V Funds.  42 U.S.C. § 801(c)(7).

4.      Treasury initially solicited data from Tribal governments, including their enrolled population, for the purpose of allocating Title V Funds.  Many eligible Tribal governments, including Plaintiff, responded by providing their actual tribal enrollment ("Actual Tribal Enrollment Metric" or "ATE Metric") to Treasury and affirmed the veracity of their submission.

5.      While Treasury ultimately decided to award sixty percent of Title V Funds on the basis of "Tribal population" ("Population Award"), Treasury elected to ignore the actual Tribal enrollment, the only justifiable basis for measuring the scope of Tribal government responsibility for its citizens impacted by COVID-19.

6.      Instead, Treasury used a flawed, preexisting population metric from the Indian Housing Block Grant program ("IHBG Metric"), which does not even intend to capture Tribal population.  (*Coronavirus Relief Fund Allocations to Tribal Governments*, United States Department of the Treasury (May 5, 2020) ("Allocation Document") at p. 2-3).  Indeed, the IGBH Metric assigns a population value of zero to twenty-five (25) federally recognized Tribal governments, which is absurd on its face.

7.      Beyond the facial irregularities, the IHBG Metric is a flawed methodology to approximate Tribal Population.   The IHBG Metric begins with the Census projection of the number of individuals who consider themselves "American Indian or Alaska Native" ("AIAN") on Census forms (within a certain geographic area).  24 C.F.R. § 1000.330.  This is a racial categorization that is neither necessary nor sufficient to count Tribal population.  It undercounts enrolled individuals who may select different racial classifications on the Census form, and it also over counts individuals who select AIAN but are not enrolled in a Tribal government.

8.     The IHBG Metric is further limited to estimated AIAN in a gerrymandered "formula area" associated with a Tribal government (*Id*.).  The "formula area" consists of (i) a Tribal Government's formula area as it existed in 2003 (24 C.F.R. § 1000.302(3)); (ii) nine static categories of property (§ 1000.302(1) (i - ix)); and (iii) areas added by application of a Tribal government and at discretion of HUD (§ 1000.302(2)).  Then, the IHBG Metric is artificially capped at "**twice a…tribe's enrolled population**" (24 C.F.R. § 1000.302(5) (emphasis added)).

9.     The IHBG Metric is an algorithm – not a tally, or even projection, of "Tribal population."   Indeed, the machinations underlying the IHBG Metric yield fractional values.  For example, the IHBG Metric for Plaintiff is, most precisely, 882.668903225806.  (Rossetti Dec., ¶9).

10.     While the IHBG Metric may have some use for the purpose for which it was intended, *i.e.*, to reflect the quantity of housing demand faced by Tribal governments, it over-counts racial natives who are not enrolled in a Tribe.  Conversely, the IHBG Metric undercounts Tribal citizens who do not live on or near Tribal government lands and Tribal citizens who did not designate themselves as AIAN on the Census.  Only Tribal enrollment numbers accurately reflect the true scope and extent of a Tribal government's responsibility to its citizens.

11.     In short, the IHBG Metric is not a suitable proxy for those persons who are served by a Tribal government.

12.     Treasury's qualitative error drives enormous quantitative differences in the allocation of Title V Funds based on the formula adopted by Treasury.  This discrepancy has been independently documented by the Harvard Project on American Indian Economic Development ("HPAIED").[1]

---

[1] Randall K.Q. Akee, Eric C. Henson, Miriam R. Jorgenson & Joseph P. Kalt, Policy Brief No. 2: Dissecting the US Treasury Department's Round 1 Allocations of CARES Act COVID-19 Relief Funding for Tribal Governments (2020).

13.     Plaintiff, Prairie Band Potawatomi, is a prime example of the disparity between the IHBG Metric and ATE Metric.  According to the IHBG Metric released by Treasury at the time of the Population Award, Treasury significantly undercounted the Prairie Band Potawatomi's enrollment and assigned it a population of 883, as compared to its actual tribal enrollment of 4,561. As a result, Prairie Band Potawatomi received $7,647,063, less than it would have received if Treasury had considered Prairie Band Potawatomi's actual enrollment.[2]

14.     In this action, brought pursuant to Administrative Procedures Act, 5 U.S.C. § 701 et seq., Prairie Band Potawatomi challenges the Treasury's reliance on the IHBG Metric because it is an arbitrary and capricious agency action that should be set aside by this Court (5 U.S.C. § 706(2)(A)).  Consequently, Prairie Band Potawatomi is entitled to a temporary restraining order and preliminary injunction restraining Treasury from disbursing the remainder of the Title V Funds, $3.2 billion, until such time as a reasonable and more accurate allocation formula can be created, and vetted by Tribal governments, to ensure that the Prairie Band Potawatomi receives its fair, proportional share of the Title V funds, as was intended by Congress.

**JURISDICTION AND VENUE**

15.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1362. The Prairie Band Potawatomi is a federally recognized Tribal government maintaining a government-to-government relationship with the United States.  The Prairie Band Potawatomi asserts claims arising under the Constitution and laws of the United States including the Administrative Procedures Act, 5 U.S.C. § 701 et seq.  The allegations of the Complaint give rise to an actual controversy within the meaning of 28 U.S.C. § 2201.

---

[2] *Id*. at p. 10, Table 5.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because the Secretary of the United States Department of the Treasury is an officer of the United States and because a substantial part of the actions or omissions giving rise to the claims occurred in this District, a substantial part of the property that is the subject of this action is located in this District, and Secretary Mnuchin maintains his principal place of business in this District.

## PARTIES

17.     Plaintiff, Prairie Band Potawatomi Nation, is a federally recognized Tribal government, which provides essential governmental services to its 4,561 enrolled citizens living on and off-reservation.  The Prairie Band Potawatomi possesses sovereign authority over the Prairie Band Potawatomi Indian Reservation located in Jackson County, Kansas.  The Prairie Band Potawatomi brings this action to assert and protect its own rights and the rights of its citizens.

18.     Defendant, Steven T. Mnuchin, is the Secretary of the United States Department of the Treasury and is sued in his official capacity.  Treasury was directed by Congress to consult with Tribal governments and the Secretary of the Interior to develop a rational formula for distributing the Title V funds to the 574 federally recognized Tribal governments.  Treasury's decision to distribute Title V funds based upon the incomplete and unreliable IHBG Metric was arbitrary and capricious because Treasury possessed, or had access to, more accurate and reliable Tribal population data, including the data submitted directly by Tribal governments at Treasury's own request.

## BACKGROUND

### A. The CARES Act and the Title V Coronavirus Relief Fund

19.     Title V of the CARES Act amends the Social Security Act (42 U.S.C. 301 et seq.), and appropriates $150 billion for "payments to States, Tribal governments, and units of local government."  42 U.S.C. § 801(a)(1).

20.     Title V defines "Tribal governments" as "the recognized governing body of an Indian tribe."  *Id.* § 801(g)(5).  The Prairie Band Potawatomi is a federally recognized Tribal government entitled to receive Title V Funds proportionate to a rational and reasonable tally of its total population.

21.     Of the $150 billion, Congress set aside $8 billion for direct payments to Tribal governments.  *Id.* § 801(a)(2)(B).

22.     Although Congress mandated that Treasury use United States Census Bureau population data for determining the distribution of Title V Funds to States and units of local government (42 U.S.C. § 801(8)), there was no such requirement for distributions to Tribal governments.[3]  Instead, Treasury was given authority—but only in consultation with the Department of the Interior and Tribal governments—to determine the appropriate allocation formula.  *Id.*  Specifically, Congress directed:

> From the amount set aside under subsection (a)(2)(B) for fiscal year 2020, the amount paid under this section for fiscal year 2020 to a Tribal government shall be the amount the Secretary shall determine, *in consultation with the Secretary of the Interior and Indian Tribes,* that is based on increased expenditures of each such Tribal government … relative to aggregate expenditures in fiscal year 2019 by the Tribal government … and determined in such manner as the Secretary determines appropriate to ensure that all amounts available under subsection (a)(2)(B) for fiscal year 2020 are distributed to Tribal governments.

---

[3] Tribal governments are treated as a distinct category from state and local governments in Title V. *See e.g. Id.* at § 801(a)(1) (referencing payments to "States, Tribal governments, and units of local government").

*Id.* (emphasis added).

### B. Treasury Solicits Information from Tribal Governments

23.    As directed by Congress, on April 2, 2020 and April 9, 2020 Treasury, and the Office of the Assistant Secretary—Indian Affairs, United States Department of the Interior, held telephonic consultation sessions, where federal officials heard from representatives of Tribal governments from across the United States. Treasury also solicited written comments from Tribal governments regarding their views on potential methodologies for the allocation of Title V Funds.

24.    On April 8, 2020, Prairie Band Potawatomi provided Treasury with a suggested methodology for allocating the Title V Funds. Prairie Band Potawatomi also participated in both consultation sessions.

25.    Following the conclusion of the consultation period, on April 13, 2020, Treasury published a form entitled "Certification for Requested Tribal Data" on its website.   The "Certification for Requested Tribal Data" sought individualized enrollment data from all 574 federally recognized Tribal governments.

26.    The Prairie Band Potawatomi provided the requested data to Treasury prior to Treasury's April 17, 2020, deadline.   The Prairie Band Potawatomi Nation Tribal Council Chairman Joseph P. Rupnick certified Plaintiff's Actual Tribal Enrollment Metric of 4,561.

### C. Treasury Changes Course and Uses the IHBG Metric

27.    On May 5, 2020, Treasury released its plan to allocate Title V Funds (the "Allocation Document").

28.    Treasury elected to award sixty percent of the Title V Funds, or $4.8 billion, "based on tribal population" because "Tribal population [was] expected to correlate reasonably well with

the amount of increased expenditures of Tribal governments related directly to the public health emergency, such as increased costs to address medical and public health needs."[4]

29.     Despite requesting enrollment data from Tribal governments only weeks earlier, and without any notice whatsoever to Tribal governments, Treasury elected to allocate the Population Award based "on population data used in the distribution of the Indian Housing Block Grant[.]" [5]

30.     Indeed, HUD maintains enrolled population data ("HUD Enrollment Metric") for the very purpose of corralling the IHBG Metric, due to the distorting effects of the formula area variable.  Yet, Treasury borrowed the block grant formula from HUD, while completely ignoring the HUD Enrollment Metric.

31.     According to Treasury, it adopted the IHBG Metric because it was purportedly a "reliable and consistently-prepared" metric, even though twenty-five Tribal governments are listed as having a population of zero, a practical impossibility.  (Allocation Doc., p. 2.)  The presence of population values of zero evinces the facial unreliability of the IHBG Metric.

32.     At the time of the Population Award, Treasury failed to provide any reason for its rejection of the ATE Metric or HUD Enrollment Metric.  And it failed to give tribal governments any advance notice that it might utilize the ill-fitting IHBG Metric, rather than the tribal enrollment numbers it solicited during the purported consultation with Tribal governments.

---

[4] U.S Dept. of the Treasury, Coronavirus Relief Fund Allocations to Tribal Governments, https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf, (last visited May 30, 2020).
[5] U.S. Dept. of the Treasury, Joint Statement by Treasury Secretary Steven T. Mnuchin and Secretary of the Interior David L. Bernhardt on Distribution of Coronavirus Relief Fund Dollars to Native American Tribes, https://home.treasury.gov/news/press-releases/sm998, (last visited Jun. 3, 2020).

33.     On May 5, 2020, the very same day that Treasury released its allocation plan, Treasury announced the first round of funding, consisting of $4.8 billion.  Pursuant to Treasury's Population Award allocation,[6] the Prairie Band Potawatomi received $2,456,891, which equates to $2,782.43 per-individual member of the Prairie Band Potawatomi counted in the IHBG Metric, i.e., a population of 883.[7]

34.     Treasury has not yet disbursed the remaining $3.2 billion of Title V Funds but is expected to do so imminently

## D. Academic Experts Criticize Treasury's Arbitrary and Capricious Reliance on the IHBG Metric

35.     A report by the Harvard Project on American Indian Economic Development, in collaboration with the University of Arizona Native Nations Institute, titled "Policy Brief No. 2: Dissecting the US Treasury Department's Round 1 Allocations of CARES Act COVID-19 Relief Funding for Tribal Governments" ("HPAIED Paper 2"), analyzed and heavily criticized Treasury's decision to use the IHBG Metric for the purpose of determining each Tribal government's Population Award.[8]

36.     The HPAIED Paper 2 concluded that: (1) the use of different, publicly available, population datasets had a significant impact on the amount of funding each Tribal government received; (2) Treasury's decision to use IHBG data prepared for the allocation of HUD housing

---

[6] U.S Dept. of the Treasury, Coronavirus Relief Fund Allocations to Tribal Governments, (2020), at p. 2, https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf, (last visited Jun. 3, 2020).

[7] There is no publicly available information concerning each Tribe's Population Award but such information has been requested from Treasury and this Complaint can be amended as soon as Treasury's data is revealed.

[8] Randall K.Q. Akee, et. al., Policy Brief No. 2: Dissecting the US Treasury Department's Round 1 Allocations of CARES Act COVID-19 Relief Funding for Tribal Governments (2020).

monies, and derived from racial population data, resulted in "a number of tribes receiving *de minimis payments*" that did not reflect the actual population of Tribal governments or Tribal needs; (3) "Treasury's decision to use racial population data from HUD's IHBG dataset demonstrably produce[d] arbitrary and capricious allocations of CARES Act funds across tribes," and; (4) the publicly available datasets were not reliable for Treasury's stated purpose, resulting in "arbitrary and capricious allocations of the CARES Act monies."[9]

37.     In addition to exposing the infirmity of the IHBG Metric for calculating Tribal government population, HPAIED Paper 2 also criticized the publicly available datasets as "arbitrary and capricious deviations from known facts regarding various tribes' enrolled citizenship counts."[10]

38.     The HPAIED Paper 2 uses the example of the Delaware Tribe of Indians (Eastern) to demonstrate the "gross anomalies" produced by Treasury's use of race-based datasets rather than Tribal government enrollment data: "[A]ccording to the IHBG dataset utilized by Treasury, the Delaware Tribe of Indians (Eastern)…has an enrolled population of more than 11,000 tribal citizens[.]"[11]  The IHBG dataset relying on race-based population data indicates that the Delaware Tribe's population is zero, meaning the Delaware Tribe's Population Award was the minimum of $100,000.  "Basing CARES Act Title V allocations on HUD's figure for enrolled population would have resulted in an allocation to the Delaware Tribe of Indians (Eastern) of approximately $24 million, instead of the $100,000 allocated by Treasury."[12]

---

[9] *Id*. at p. 2.
[10] *Id*. at p. 4.
[11] *Id*. at p. 7.
[12] *Id*.

39.     HPAIED Paper 2 argues that Treasury's approach "creates demonstrable inequity in the form of gross and frequent 'under-representation' and 'over-representation' of hundreds of tribes in the allocation process[.]"[13] Overall, the HPAIED Paper 2 maintains that the most accurate count of Tribal government population is enrollment because this is the true measure of "the population to which tribal governments are responsible and over which they have jurisdiction."[14]

40.     In a subsequent HPAIED Policy Brief (HPAIED Paper 3), HPAIED concluded that Tribal enrollment should be used as the proper metric for determining any population-based allocation of Title V Funds.[15] "Tribes are governing entities, populated by citizens—persons to which tribal governments owe duties of service and over whom they have jurisdiction."[16] A Tribal government's obligations to its citizens does not end at the reservation line, as "tribe after tribe is reaching beyond its geographic borders to serve their off-reservation citizens[.]"[17] Thus, "the appropriate measure of population in a sound allocation formula is the number of enrolled tribal citizens immediately before the coronavirus pandemic struck the U.S."[18]

41.     Conversely, the use of the IHBG Metric, which "focuses on the racial make-up of the residents of reservations and related tribal areas" is "appropriate for purposes of a federal housing program" but it is "wholly inappropriate data for the purposes of federal funding—i.e., the CARES Act—that is explicitly aimed at supporting the economic stability and function of tribal governments."[19]

---

[13] *Id*. at p. 13.
[14] *Id*. at p. 14.
[15] Randall K.Q. Akee, Eric C. Henson, Miriam R. Jorgenson & Joseph P. Kalt, Policy Brief No. 3: Proposal for a Fair and Feasible Formula for the Allocation of CARES Act COVID-19 Relief Funds to American Indian and Alaska Native Tribal Governments (2020).
[16] *Id*. at p. 6.
[17] *Id*.
[18] *Id*.
[19] *Id*. (emphasis in original)

### E. Prairie Band Potawatomi Members are Undercounted by the IHBG Metric

42.    As noted, the IHBG Metric relied upon by Treasury to distribute the Population Award to the Prairie Band Potawatomi used the single-race data category and indicated a total population of 883.[20]  This compares to its actual enrollment of 4,561.

43.    Prairie Band Potawatomi's "formula area" is limited to the Prairie Band Potawatomi Reservation in Jackson County, Kansas.[21]  The IHBG Metric fails to account for Tribal citizens who reside outside of the "formula area" despite the fact that many Tribes, including the Prairie Band Potawatomi, provide services to off-reservation members.  The Prairie Band Potawatomi provides services to all of its citizens, regardless if they reside on or off-reservation.

44.    Prairie Band Potawatomi has limited its participation in the IHBG program.  The Prairie Band Potawatomi has only 17 HUD-funded housing units on its reservation.  The IHBG Metric, based on Census numbers, is also skewed against Tribal governments whose citizens refuse to take part in Census data gathering.

45.    Unsurprisingly, Treasury's data set grossly undercounted the Prairie Band Potawatomi's total enrolled population, by 3,678, or approximately eighty percent.

46.    Upon information and belief, the Prairie Band Potawatomi was not the only Tribal government that was under-represented by the IHBG Metric relied upon by Treasury in distributing the Population Award.  A total of twenty-five Tribal governments received a population value of zero, a result which on its face demonstrates the fatal flaws in Treasury's methodology.

---

[20] U.S Dept. of the Treasury, Coronavirus Relief Fund Allocations to Tribal Governments, (2020), fn. 9, https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf, (last visited Jun. 3, 2020).

[21] The Dept. of Housing and Urban Development, FY 2020 IHBG Final Allocation Formula Area, (2020), at p. 19, https://www.hud.gov/sites/dfiles/PIH/documents/FY%202020%20Final%20Summary%20-%20Formula%20Area.pdf, (last visited June 2, 2020).

47.     Pursuant to Treasury's Population Award formula,[22] the Prairie Band Potawatomi received $2,456,891 based on the IHBG Metric of 883.[23]

48.     According to HPAIED Paper 2, if Treasury had used the HUD Enrollment Metric[24], reflecting an enrolled population of 4,841, Prairie Band Potawatomi's Population Award would have been $7.65 million greater.[25]

### F. Treasury's Post Hoc Rationalization

49.     On June 4, 2020, weeks after the Population Award, Treasury released a document entitled: "Coronavirus Relief Fund Frequently Asked Questions on Tribal Population," ("FAQ"),[26] which, apparently, was intended to address the criticism of Treasury's allocation methodology.

50.     Not only was the FAQ a belated attempt to bolster Treasury's shoddy allocation methodology but the FAQ also failed to resolve the legal and logical issues with using the IHBG Metric to determine the Population Award.

51.     Treasury explained that it rejected the ATE Metric because "Tribal enrollment does not provide a consistent measure of tribal population across tribes…Tribal enrollment criteria set forth in tribal constitutions, articles of incorporation, or ordinances, and vary from tribe to tribe."[27]

---

[22] U.S Dept. of the Treasury, Coronavirus Relief Fund Allocations to Tribal Governments, (2020), at p. 2, https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf, (last visited Jun. 3, 2020).

[23] There is no publicly available information concerning each Tribe's Population Award but such information has been requested from Treasury and this Complaint can be amended as soon as Treasury's data is revealed.

[24] The Dept. of Housing and Urban Development, *FY 2020 Estimate Allocation Sheets* (2020).

[25] Randall K.Q. Akee, et. al., Policy Brief No. 2: Dissecting the US Treasury Department's Round 1 Allocations of CARES Act COVID-19 Relief Funding for Tribal Governments, p. 10, Table 4 (2020).

[26] The Dept. of the Treasury, Coronavirus Relief Fund Frequently Asked Questions on Tribal Population, (2020), https://home.treasury.gov/system/files/136/FAQ-on-Tribal-Population-Data.pdf, (last visited June 6, 2020).

[27] *Id*. at p. 2.

52.     Treasury's post hoc rationalization for its decision to rely on the race-based IHBG Metric, rather than the ATE Metric, displays a profound misunderstanding of the very nature of Tribal sovereignty and a Tribal government's obligation to all of its citizens, regardless of where they may reside.

### G. Prairie Brand Potawatomi Has Standing to Bring This Action.

53.     Treasury's allocation formula has caused injury to the Prairie Band Potawatomi by reducing the Tribe's proportionate share of the Population Award.  Treasury's pending disbursement of the remainder of the Title V Funds threatens the Prairie Band Potawatomi with imminent, irreparable, injury because the exhaustion of Title V Funds will leave the Tribe without an adequate remedy.

54.     The Prairie Band Potawatomi has incurred significant medical and public health expenses in responding to the devastation resulting from the COVID-19 pandemic.  The Tribe continues to provide essential services to its citizens residing on-reservation and off-reservation.

55.     The Prairie Band Potawatomi is entitled its proportionate share of the Title V Funds based upon a reasonable allocation formula that bears a rational relationship to the actual enrollment population of the Tribe.  Congressional intent to provide emergency relief to Tribal governments is frustrated by the failure to use accurate Tribal population data because Tribal government COVID-19 response efforts are proportionately underfunded.

56.     Treasury is expected to disburse the remainder of the CARES Act funds in the very near future, and the Prairie Band Potawatomi's injury is imminent.  The Prairie Band Potawatomi requires Title V funds to provide essential services to its citizens during this pandemic.  If Treasury is not immediately enjoined from disbursing the remainder of the Title V funds, the Prairie Band Potawatomi will have no adequate remedy at law because the Title V funds will be totally depleted

following the second disbursement.  Consequently, the Prairie Band Potawatomi respectfully requests the Court to preliminarily enjoin Treasury from disbursing the remainder of the Title V Funds, $3.2 billion, until such time as a reasonable and more accurate allocation formula can be created, and vetted by Tribal governments, to ensure that the Prairie Band Potawatomi receives its fair, proportional share of the Title V Funds, as was intended by Congress.

**COUNT I**: **Declaratory and Injunctive Relief under 5 U.S.C. § 706, and 28 U.S.C. §§ 2201-2202**

57.    The Prairie Band Potawatomi restates and realleges the preceding paragraphs and allegations as if fully stated herein.

58.    The Administrative Procedures Act ("APA") authorizes judicial review of agency actions.  5 U.S.C. § 702.

59.    The APA allows a Court to set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.  5 U.S.C. § 706(2)(A).

60.    Treasury's decision to adopt the IHBG Metric for the basis of the Population Award, was arbitrary and capricious under the APA.

61.    Treasury's rationale for adopting the IHBG Metric was based on descriptions of the IHBG Metric that were plainly inaccurate and inferences about the IHBG Metric that were unwarranted, including (i) that the IHBG Metric is "reliable and consistently-prepared" (ii) that IHBG Metric captures Tribal population; (iii) that Tribal governments are familiar with and scrutinize the IHBG Metric and (iv) that the IHBG Metric's reliance on Census Bureau data is a benefit for the purposes of disbursement of Title V Funds.

62.    Treasury's allocation ignores legislative intent.  Congress directed Treasury to make payments to Tribal governments, which use enrollment data to provide services to their

citizens.   The IHBG Metric is facially flawed, as it contains population values, for Tribal governments, of zero.   The IHBG Metric relies upon race-based population data that is not an accurate measurement of a Tribal government's obligation to provide essential services to its citizens.   Moreover, the "formula area" fails to take into account Tribal citizens who reside outside of the geographic area used by HUD to determine Tribal housing needs.   Treasury's allocation formula also fails to take into account the variation in Tribal government participation in the IHBG program and/or Tribal citizen participation in U.S. Census data gathering.

63.   Treasury's reliance upon the IHBG Metric resulted in undercounting of Tribal citizens and, thus, underpayment to numerous Tribal governments including the Prairie Band Potawatomi.   The IHBG Metric also exaggerates Tribal population for Tribal governments that provide housing assistance services to non-members within the Tribe's formula area, likely resulting in over-payment to such Tribal governments.

64.   Treasury failed to explain why the IHBG Metric, which by Treasury's own account, was "developed by HUD for the specific context of the IHBG program," should be used for the Population Award meant to compensate Tribal Governments for budget shortfalls, rather than capital improvements to housing stock.

65.    Treasury adopted the IHBG Metric, despite far better alternatives including the HUD Enrollment Metric and the ATE Metric.

66.   Treasury ignored the ATE Metric and the HUD Enrollment Data without explanation.   (*See* Allocation Document).   The FAQ, a post hoc rationalization, cannot rescue Treasury's flawed decision.

67.   The APA also directs a Court to set aside agency actions that fail to observe procedure required by law.  5 U.S.C. § 706(2)(A).

68.     Title V of the CARES Act granted Treasury the discretion to determine an appropriate method of allocating Title V funds to Tribal governments.  42 U.S.C. § 801(7).

69.     One of the explicit constraints on Treasury's discretion in determining how to award funds is that Treasury was required to consult with Tribal governments.

70.     Tribal governments had no reason to expect that Treasury would select the IHBG Metric as the basis for awarding funds, particularly where Tribal governments had just submitted their ATE Metric to Treasury.  Tribal governments were, therefore, deprived of a reasonable opportunity to consult on the weaknesses of the IHBG Metric.

71.     The Prairie Band Potawatomi is entitled to a temporary restraining order pending a hearing for a preliminary injunction enjoining Secretary Mnuchin from distributing the remaining $3.2 billion in Title V Funds until a reasonably accurate formula for determining Tribal population is developed and implemented by Secretary Mnuchin.

## PRAYER FOR RELIEF

Wherefore, the Prairie Band Potawatomi respectfully requests the Court:

1.     Enter judgment pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706 declaring that Treasury's use of the IHBG Metric to distribute Title V funds was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and procedural requirements;

2.     Enjoin Treasury and Secretary Mnuchin from distributing, disbursing, or otherwise depleting the remaining $3.2 billion in Title V funds until such time as a more accurate formula for determining Tribal population is developed consistent with the purpose of the CARES Act and from awarding funds until at least twenty-one days after publishing a revised allocation formula;

3.     Award the Prairie Band Potawatomi its reasonable attorney fees, costs, and such other and further relief as the Court deems just and proper.

Dated this 8th Day of June, 2020.

LIPPES MATHIAS WEXLER FRIEDMAN LLP

Carol E. Heckman*
James P. Blenk*
Lee M. Redeye*
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
Telephone: (716) 560-7744
checkman@lippes.com
jblenk@lippes.com
lredeye@lippes.com
*Application for admission *Pro Hac Vice*
forthcoming

-and-

 */s/* Michael G. Rossetti
Michael G. Rossetti, DC Bar No. 477122
1900 K Street, NW, Suite 730
Washington, DC 20006
Telephone: (202) 888-7610
mrossetti@lippes.com

*Counsel for the Prairie Band Potawatomi Nation*