# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Prairie Band Potawatomi Nation,

    Plaintiff,

  v.             No. 20-cv-1491

Steven Mnuchin, in his official capacity as
Secretary of the United States Department of the
Treasury,

    Defendant.

## MEMORANDUM IN RESPONSE TO PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Background ............................................................................................................................ 3

Standard of Review ............................................................................................................... 6

Argument ............................................................................................................................... 7

I.      Plaintiff is unlikely to prevail on the merits of its claims. ......................................... 7

        a.     Treasury's disbursement of CARES Act funds to Tribal governments is not subject to APA review ........................................................................................ 7

        b.     Treasury's tribal allocation methodology is not arbitrary and capricious ................. 11

        c.     Treasury complied with any procedural requirements in the CARES Act in adopting its methodology for disbursement of the Funds. .......................................... 16

II.     Plaintiff has not established any certain, irreparable harm. ..................................... 17

III.    The balance of equities and public interest disfavor Plaintiff's requested preliminary injunction ........................................................................................................................ 17

Conclusion ........................................................................................................................... 19

i

## TABLE OF AUTHORITIES

**CASES**

*Agua Caliente Band of Cahuilla Indians v. Mnuchin*,
No. 20-CV-01136 (APM), 2020 WL 2331774 (D.D.C. May 11, 2020) ........................................ 11

*Alphapointe v. U.S. Dep't of Veterans Affairs*,
416 F. Supp. 3d 1 (D.D.C. 2019) ................................................................................................. 7

*Archdiocese of Washington v. Washington Metro. Area Transit Auth.*,
897 F.3d 314 (D.C. Cir. 2018) ..................................................................................................... 7

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ................................................................................................................... 11

*Confederated Tribes of Chehalis Reservation v. Mnuchin*,
No. 20-CV-01002 (APM), 2020 WL 1984297 (D.D.C. Apr. 27, 2020) ........................................ 9

*Elec. Info. Privacy Ctr. v. U.S. Dep't of Justice*,
15 F. Supp. 3d 32 (D.D.C. 2014) ................................................................................................. 7

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ................................................................................................................... 11

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1975) ................................................................................................... 18

*Heckler v. Chaney*,
470 U.S. 821 (1985) ..................................................................................................................... 8

*Henke v. Dep't of the Interior*,
842 F. Supp. 2d 54 (D.D.C. 2012) ............................................................................................. 17

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
407 F.3d 1250 (D.C. Cir. 2005) ................................................................................................. 16

*Jackson v. Mabus*,
808 F.3d 933 (D.C. Cir. 2015) ................................................................................................... 11

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ............................................................................................................. 2, 8, 9

*Milk Train Inc. v. Veneman*,
310 F.3d 747 (D.C. Cir. 2002) .......................................................................................... 9, 10, 15

*Morris v. Gressette*,
432 U.S. 491 (1977) ................................................................................................................... 10

*Nat'l Conf. on Ministry to the Armed Forces v. James*,
278 F. Supp. 2d 37 (D.D.C. 2003) ............................................................................... 7

*Petry v. Block*,
737 F.2d 1193 (D.C. Cir. 1984) ................................................................................. 16

*PSWF Corp. v. F.C.C.*,
108 F.3d 354 (D.C. Cir. 1997) ................................................................................... 15

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ................................................................................... 17

*Sierra Club v. U.S. E.P.A.*,
167 F.3d 658 (D.C. Cir. 1999) ................................................................................... 15

*Stilwell v. Office of Thrift Supervision*,
569 F.3d 514 (D.C. Cir. 2009) ................................................................................... 11

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ......................................................................................................... 6

*Women Involved in Farm Econ. v. U.S. Dep't of Agric.*,
876 F.2d 994 (D.C. Cir. 1989) ................................................................................... 12

**STATUTES**

5 U.S.C. § 701 .......................................................................................................... 8, 10

5 U.S.C. § 706 .............................................................................................................. 15

42 U.S.C. § 801 ...................................................................................................... *passim*

**REGULATIONS**

24 C.F.R. § 1000.302 ................................................................................................ 5, 14

24 C.F.R. § 1000.330 ................................................................................................... 5

**OTHER AUTHORITIES**

Coronavirus Relief Fund Tribal Allocation Methodology, U.S. Department of Treasury
(May 5, 2020),
https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-
Methodology .pdf ..................................................................................................... 4, 5

Frequently Asked Questions on Tribal Population, U.S. Department of Treasury (June 4, 2020),
https://home.treasury.gov/system/files/136/FAQ-on-Tribal-Population-Data.pdf ........................ 12

**Introduction**

Plaintiff asserts that the Department of Treasury's method for allocating certain emergency funds is statutorily unlawful (even though the relevant statute is silent on the issue, leaving the development of that methodology to Treasury's discretion), and Plaintiff thus requests that the Court indefinitely enjoin disbursement of the remaining emergency funds while the parties jointly deliberate and craft a new method (even though, as this Court has already indicated, the statute also requires prompt payment). Plaintiff's claim lacks merit, and the Court should therefore deny the motion for preliminary relief.

Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act" or "Act") to rapidly inject financial aid into the economy due to COVID-19. One provision requires Treasury to distribute $8 billion dollars to Tribal governments based on their "increased expenditures" attributable to COVID-19. The Act does not identify (or even describe) the methodology Treasury must use in calculating payments based on "increased expenditures," nor does it require Treasury to consider data from one source over another. In exercising its discretion, Treasury elected to distribute 60% of the funds to Tribal governments based roughly on Tribal population size—which would serve as a proxy for estimating increased expenditures—and implemented this scheme by relying on Decennial Census American Indian Alaskan Native ("AIAN") data used by the Department of Housing and Urban Development ("HUD") in its Indian Housing Block Grant ("IHBG") Program. Treasury determined that the remaining 40% would be distributed based on employment and expenditure data.

Plaintiff now claims that Treasury's decision to utilize HUD population data was arbitrary and capricious under the Administrative Procedure Act ("APA") since, in Plaintiff's view, this data does not sufficiently track actual Tribal enrollment. Plaintiff's claim fails for a number of reasons. First,

pursuant to the Supreme Court's decision in *Lincoln v. Vigil*,[1] Treasury's determination was a prototypical funding allocation decision that is committed to agency discretion, and thus unreviewable under the APA. The CARES Act expressly confirms that this determination is left to Treasury's discretion, noting that "the amount paid . . . to a Tribal government shall be . . . determined *in such manner as the Secretary determines appropriate*."[2] Furthermore, Treasury's disbursement methodology is also unreviewable since Congress required prompt distribution of funds, thus implicitly precluding judicial review.

Second, Treasury's decision undoubtedly satisfies the deferential "arbitrary and capricious" standard. Treasury need not select the ideal (or Plaintiff's preferred) disbursement methodology, or rely on any particular data source. Treasury need only engage in reasoned decision-making. Here, Treasury had to quickly form and implement a disbursement methodology; one that could perform the inherently difficult task of estimating current and *future* expenditures attributable to COVID-19. Given the circumstances, Treasury's decision to distribute funds based on population data from a pre-existing, annually maintained, and verified data source is certainly reasonable. Plaintiff, in response, simply nitpicks the methodology, identifying certain minor flaws. But Plaintiff cannot establish that the methodology is *unreasonable*. No methodology can predict, with certainty, any given Tribe's increased expenditures stemming from COVID-19, and Treasury's methodology is not "arbitrary and capricious" simply because Plaintiff believes it has a marginally superior alternative.

Third, there is no certain, irreparable harm. Although Plaintiff alleges that its population was undercounted under Treasury's methodology, it may only receive a greater share of the fixed amount allocated to Tribal governments if other Tribal populations were *not* sufficiently "undercounted." After all, if Treasury concludes under a new methodology that other Tribal populations *were* undercounted

---

[1] 508 U.S. 182, 192 (1993).
[2] 42 U.S.C.A. § 801(c)(7) (emphasis added).

2

to a greater degree than Plaintiff's population, Plaintiff's *pro rata* share of the fixed funds could remain the same (or even drop). Plaintiff could receive no additional payment, or a *de minimis* payment. Neither would justify the extraordinary relief sought here.

Fourth, the balance of equities and public interest counsel against Plaintiff's requested relief. Plaintiff knew of Treasury's methodology for Tribal population counts since May 5, 2020, and yet waited over a month to bring suit. In the meantime, Treasury has committed significant resources to disburse the remaining Tribal funds by this Friday, June 12. Plaintiff now seeks relief that would undercut these efforts, since Treasury would have to delay those payments, and more importantly, create a new methodology for allocating those payments. Additionally, speedy disbursal is in the public interest. These funds are intended to provide timely relief for expenditures that exist now, and continue to grow. Indeed, as this Court is aware, certain Tribes have already brought suit to accelerate these payments.[3] Plaintiff's requested relief would require a time-consuming process whereby Treasury would have to adopt a new methodology—possibly requiring additional consultation with Indian Tribes—which could take months.

Accordingly, the Court should deny Plaintiff's request for emergency relief.

## Background

In response to the COVID-19 pandemic, Congress enacted the CARES Act on March 25, 2020. Among other things, the Act appropriated $8 billion dollars for "payments to Tribal governments" ("the "Funds"). 42 U.S.C. § 801(a)(2). The Act tasks the Treasury Department with disbursing the Funds, and in addressing who the Funds shall be distributed to, and in what amount, the Act states:

> [T]he amount paid . . . to a Tribal government shall be *the amount the Secretary shall determine*, in consultation with the Secretary of the Interior and Indian Tribes, that is based on increased expenditures of each such Tribal government (or a tribally-owned entity of such Tribal government) relative to aggregate expenditures

---

[3] Compl., *Agua Caliente Band of Cahuilla Indians v Mnuchin*, 20-cv-1136 (D.D.C. Apr. 30, 2020).

3

> in fiscal year 2019 by the Tribal government (or tribally-owned entity) and determined *in such manner as the Secretary determines appropriate* to ensure that all amounts available under subsection (a)(2)(B) for fiscal year 2020 are distributed to Tribal governments.

42 U.S.C. § 801(c)(7) (emphasis added). The Act provides no further, specific guidance on how the Funds are to be distributed; it identifies no data type that Treasury must consider in estimating "increased expenditures" by Tribal governments (*e.g.*, population size), nor does it require Treasury to consult data from any particular source (*e.g.*, population data certified by Tribal governments). Additionally, the Act notes that, "[s]ubject" to certain exceptions not relevant here, "not later than 30 days after March 27, 2020, the Secretary [of Treasury] shall pay each . . . Tribal government," from the Funds, "the amount determined for" the "Tribal government." 42 U.S.C. § 801(b).

Consistent with the Act's requirement, Treasury held two telephonic consultation sessions with Tribal leaders, and reviewed written submissions from the Tribes. *See* Compl. ¶ 23. As Plaintiff points out, "Treasury also solicited written comments from Tribal governments regarding their views on potential methodologies for the allocation." PI Mot., at 4. Treasury ultimately adopted a methodology that balances a number of competing factors, including the need to disburse the funds quickly, and in a manner that is both consistent with the Act's objective and administratively feasible. *See* Coronavirus Relief Fund Tribal Allocation Methodology, U.S. Department of Treasury, https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf, at 1 (May 5, 2020) (hereinafter, "Allocation Mem."). Under this methodology, Treasury committed to distribute the Funds in two waves. In the first wave, Treasury sought to immediately distribute 60% of the Funds based roughly on Tribal population ("Wave One"). *See id.* at 2. Treasury concluded that "Tribal population is expected to correlate reasonably well with the amount of increased expenditures" due to COVID-19. *Id.*

To ensure speedy disbursement of the Funds, Treasury, in its discretion, chose to rely on pre-

existing and reliable data, the Decennial Census AIAN data used by HUD for its IHBG program. *See id.* In assembling this data, HUD first designated "formula areas," which correspond "broadly with the area of a Tribal government's jurisdiction and other area to which the Tribal government's provision of services and economic influence extend." *Id.*; *see also* 24 C.F.R. § 1000.302 ("Formula areas" include "Reservations for federally recognized Indian tribes, as defined by the U.S. Census"). For accuracy, the "formula areas" also include "adjustments to address overlapping jurisdictions." Allocation Mem., at 3; *see also* 24 C.F.R. § 1000.302(3). HUD uses Decennial Census data to determine "the American Indian and Alaska Native population count" of "each Tribe's 'formula area.'" Allocation Mem., at 2; *see also* 24 C.F.R. § 1000.330(b)(1). HUD "adjust[s]" this figure "for any statistically significant undercount for [American Indian and Alaska Native] population confirmed by the U.S. Census Bureau" and updates the figure "annually using the U.S. Census Bureau county level Population Estimates for Native Americans." 24 C.F.R. § 1000.330(b)(1). "Tribal governments are familiar with" this data "and have already been provided the opportunity to scrutinize and challenge its accuracy." Allocation Mem., at 2; *see also* 24 C.F.R. § 1000.330(c) ("Indian tribes may challenge the [population] data" used by HUD). Additionally, "[f]or Indian Tribes not included in the IHBG population data, HUD provided population figures at Treasury's request." Allocation Mem., at 3.

As a protective measure, and in response to comments from Indian Tribes, Treasury also generally guaranteed a minimum payment of $100,000 to Tribal governments that would have otherwise received less than $100,000 under Treasury's methodology for estimating population count. *See id.* Treasury started issuing Wave One payments, pursuant to this methodology, on May 5, 2020. *See* Kowalski Decl. ¶ 14, ECF No 26-1, *Agua Caliente Band of Cahuilla Indians v Mnuchin*, 20-cv-1136 (D.D.C. May 6, 2020).

Treasury determined that the second wave of payments, constituting 40% of the Funds, would be "based on employment and expenditures data of Tribes and tribally-owned entities" ("Wave Two").

*See* Allocation Mem., at 2. To facilitate these payments, Treasury requested employment and expenditure data from Tribal governments, but made clear that it could issue funds only "after data on employment and expenditures are received, reasonably verified, and accounted for in the allocation formula." *Id.* Wave Two payments were delayed since certain Tribes did not promptly submit the requested data, and Treasury found issues pertaining to certain data that was submitted by other Tribes. *See* Kowalski Decl. ¶¶ 4-6, ECF No 36-1, *Agua Caliente Band of Cahuilla Indians v Mnuchin*, 20-cv-1136 (D.D.C. June 2, 2020). Treasury anticipates commencing these payments on June 12, 2020. *See id.* ¶ 7.

On June 8, 2020, Plaintiff Prairie Band Potawatomi Nation brought suit challenging Treasury's methodology for estimating Tribal population, and simultaneously moved for emergency relief—even though Treasury published its methodology over a month ago, on May 5, 2020. Plaintiff claims that, despite the broad discretion accorded to the Treasury in disbursing the Funds, Treasury's methodology is unlawful since it relies on imperfect data for Tribal population counts. Plaintiff thus requests that the Court *(i)* enjoin Treasury's disbursement of Wave Two payments, *(ii)* order Treasury to undergo an elaborate process—including another round of consultations—to settle on a more perfect methodology for calculating Tribal populations, and *(iii)* order Treasury to use funds from Wave Two to ensure that all Tribes that were allegedly "underpaid" in Wave One receive additional compensation. *See*, *e.g.*, Compl. ¶ 56. Plaintiff's claim lacks merit. For this reason, and others, the Court should deny Plaintiff's motion for preliminary relief.

## Standard of Review

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

the public interest." *Id.* at 20.

Courts in this Circuit traditionally have evaluated these four factors on a "sliding scale"—if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Alphapointe v. U.S. Dep't of Veterans Affairs*, 416 F. Supp. 3d 1, 8 (D.D.C. 2019) (Mehta, J.). *Winter*, however, called that approach into doubt and sparked disagreement over whether the "sliding scale" framework continues to apply, or whether a movant must make a positive showing on all four factors without discounting the importance of a factor simply because one or more other factors have been convincingly established. *Id.* This question remains undecided by the D.C. Circuit. *See Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018).

Finally, where a movant seeks mandatory injunctive relief, *i.e.*, an injunction that "would alter, rather than preserve, the status quo by commanding some positive act—the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Elec. Info. Privacy Ctr. v. U.S. Dep't of Justice*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (citations omitted); *see also Nat'l Conf. on Ministry to the Armed Forces v. James*, 278 F. Supp. 2d 37, 43 (D.D.C. 2003) ("A district court should not issue a mandatory preliminary injunction unless the facts and law clearly favor the moving party." (quotation omitted)).

## Argument

### I.   Plaintiff is unlikely to prevail on the merits of its claims.

   *a.   Treasury's disbursement of CARES Act funds to Tribal governments is not subject to APA review.*

Agency Discretion. First, the selection of an appropriate distribution methodology is committed to Treasury's discretion and is thus not subject to APA review. The APA's judicial review

provisions do not apply to "agency action" that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Under this provision, "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). "In such a case," the relevant statutory provision "can be taken to have committed the decisionmaking to the agency's judgment absolutely." *Id.* (internal quotation marks omitted).

Here, the Supreme Court has expressly noted that "[t]he allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). "After all, the very point of a lump-sum appropriation is to give an agency the capacity" to "meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id*. Consistent with this principle, the CARES Act clearly leaves the selection of an appropriate distribution methodology to the Treasury's informed discretion. Although the Act requires Treasury to consult with Indian Tribes, and generally base its chosen methodology "on increased expenditures of each" Tribal government, the Act expressly notes that "the amount paid . . . to a Tribal government shall be . . . determined *in such manner as the Secretary determines appropriate*." 42 U.S.C. § 801(c)(7) (emphasis added). Thus, the Act provides no "meaningful standard against which to judge" whether Treasury's methodology is properly "based on increase expenditures." *Heckler*, 470 U.S. at 830. The determination of a proper methodology is left to the Treasury's discretion.

*Lincoln v. Virgil* is on point. There, the Indian Health Service ("IHS") had received "lump-sum appropriations" which were to be used for, among other things, "the benefit, care, and assistance of the Indians," and "Indian mental-health care." *Lincoln*, 508 U.S. at 184. Initially, from these appropriations, the IHS offered a regional Indian children's health care program in the southwest region of the United States. *See id.* The IHS eventually chose to reallocate the funds from this program

8

for a "nationwide effort to assist such children," and plaintiffs—beneficiaries of the prior regional program—brought suit. The Court concluded that the IHS's decision was not subject to APA review. After noting that the distribution of lump-sum appropriations is "traditionally regarded as committed to agency discretion," the Court concluded that "as long as the agency allocates funds . . . to meet permissible statutory objectives," the APA's "agency discretion" exception "gives the courts no leave to intrude." *Id.* 192-93. Since the relevant appropriation statutes "[spoke] about Indian health only in general terms," the IHS's decision "clearly [fell] within [its] statutory mandate." *Id.* at 194. Likewise, here, the Act sets forth the Funds' objective in "general terms" (*e.g.*, to cover "increased expenditures"), but sets no concrete restrictions on *how* Treasury may meet this objective. Thus, Treasury's decision here, like the IHS's decision in *Lincoln*, is not subject to APA review.[4]

The D.C. Circuit's decision in *Milk Train, Inc. v. Veneman* is equally instructive. 310 F.3d 747 (D.C. Cir. 2002). There, a statute "appropriated $325 million" to "benefit livestock and dairy producers" and "direct[ed] that the funds be disbursed '*in a manner determined appropriate by the [Agriculture] Secretary*'"—language nearly identical to the CARES Act's instruction that the Funds be disbursed in amounts "determined in such manner as the [Treasury] Secretary determines appropriate." *Id.* at 749. The Statute further stated that "no less than $125 million" must be directed to dairy producers to compensate "for economic losses incurred during 1999." *Id.* And Congress also stated—again, similar to the CARES Act—that "the payments be made 'as soon as practicable.'" *Id.* In distributing the funds, the Agriculture Secretary "capp[ed] . . . the amount of milk production that would be eligible for financial assistance," and plaintiff, a milk producer, brought suit. *Id.* at 750. The

---

[4] In the related *Chehalis* matter, this Court expressly left open the possibility that "it would be foreclosed from reviewing a decision on how much to award a particular Tribal government in Title V funds." *Confederated Tribes of Chehalis Reservation v. Mnuchin*, No. 20-CV-01002 (APM), 2020 WL 1984297, at *5 n.6 (D.D.C. Apr. 27, 2020). That is precisely the issue here: Plaintiff contests the methodology that determines "how much" Treasury would "award a particular Tribal government in Title V funds."

9

D.C. Circuit concluded that the compensation cap was not subject to APA review. The court explained:

> Congress provided that the moneys for 1999 economic losses were to be used "to provide assistance directly to dairy producers, in a manner determined appropriate by the Secretary." . . . [T]he plain language [of the statute] indicates that Congress left to the Secretary the decision about how the moneys for 1999 economic losses could best be distributed consistent with its general policy to provide emergency assistance to dairy farmers "[a]s soon as practical." . . . The statute thus provides no relevant "statutory reference point" for the court other than the decisionmaker's own views of what is an "appropriate" manner of distribution to compensate for 1999 losses.

*Id.* at 751. Here, likewise, the Act uses similar language ("as the Secretary determines appropriate"), provides a similar abbreviated deadline, and provides no other "statutory reference point" for assessing whether a methodology is "appropriately" based on "increased expenditures" of Tribal governments "other than [Treasury's] own views."[5] Accordingly, the selection of an appropriate allocation methodology is committed to Treasury's discretion and is not subject to APA review.

> Preclusion of APA Review. The abbreviated time-frame for disbursing the Funds confirms that Congress did not intend for APA review of Treasury's disbursement of the Funds. The APA states that its remedy does not apply when a "statute[] preclude[s] judicial review." 5 U.S.C. § 701(a)(1). Courts have long recognized that imminent statutory deadlines for administrative actions are strong indicia that Congress did not intend for these actions to be subject to judicial review. *See Morris v. Gressette*,

---

[5] To be sure, the D.C. Circuit held that one element of the Agriculture Secretary's guidance *may* be subject to APA review, but the circumstances were unique. Specifically, the plaintiff claimed that the Secretary distributed part of the emergency funds to cover losses incurred in 1997 and 1998, even though the statute provided aid for "economic losses incurred during *1999*." *Milk Train*, 310 F.3d at 752 (emphasis added). The court found that the "agency discretion" exception may not apply since the Secretary herself "instructed . . . field offices . . . to allow dairy producers to collect funds . . . as compensation for losses in 1997 and 1998." *Id.* at 755. The court thus remanded the matter so the Secretary could provide additional information *See id.* at 756. The court stated that if the Secretary clarified that she "intended" for the funds to be used only for "1999 losses," then her "implementing guidance involved the manner of distribution over which the court has no jurisdiction to review." *Id.* at 755. Here, there is no question that Treasury intends for all funds to cover "increased expenditures" occasioned by COVID-19, as instructed by the Act.

432 U.S. 491, 503-505 (1977) (reasoning that Congress did not intend for judicial review of DOJ decisions regarding changes to State voting procedures since "Congress had intended the approval procedure to be expeditious" and "reviewability would unnecessarily extend the period the State must wait for effecting its change."); *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 350 (1984) (citing to *Morris* as a prime example of a "statutory scheme" establishing that judicial review is unavailable). Here, given unique circumstances presented by a global pandemic, Congress ordered Treasury to distribute the Funds within thirty-days, 42 U.S.C. § 801(b)(1), and this Court has made clear in related litigation that Treasury cannot delay payments indefinitely beyond this date, *see Agua Caliente Band of Cahuilla Indians v. Mnuchin*, No. 20-CV-01136 (APM), 2020 WL 2331774, at *1 (D.D.C. May 11, 2020). Litigation over the allocation methodology of these funds would undeniably delay payment; indeed, Plaintiff here *requests* a delay. Thus, given the Act's language, and purpose, it is clear that Congress intended to preclude challenges relating to Treasury's disbursement of the Funds.

   b.  *Treasury's tribal allocation methodology is not arbitrary and capricious.*

   In any event, Plaintiff's claim fails on the merits since Treasury's disbursement methodology satisfies the deferential "arbitrary and capricious" standard. The relevant inquiry under the APA's "arbitrary and capricious" provision is "narrow," requiring only that "an agency examine the relevant data and articulate a satisfactory explanation for its action." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). A "court is not to substitute its judgment for that of the agency," and "should uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." *Id.* at 513-14. At bottom, "the question is whether the agency action was reasonable and reasonably explained." *Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015). This is a "deferential standard." *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009).

   Here, Treasury's decision to distribute a portion of the Funds based on IHBG population data undoubtedly satisfies this deferential standard. Treasury had to quickly settle on a methodology based

11

on a number of (often competing) factors; the methodology had to (i) estimate any given Tribe's current and future COVID-related expenditures, an inherently difficult predictive exercise, (ii) allow for prompt distribution, and (iii) be administratively feasible. Based on its expertise, Treasury opted to use the pre-existing IHBG population data for a number of reasons. First, this data—which is adjusted and updated annually, *see supra* at 5—reflects the number of people who both self-identified as Indian on the Census, and reside in a Tribe's formula area (which generally tracks the Tribe's jurisdiction and where it provides services). This is certainly a reasonable (even if imperfect) means for estimating a Tribe's population, and thus a reasonable means for estimating the number of people for whom a Tribe must expend resources in light of COVID-19.

Second, other programs that provide benefits to Tribal governments also rely on the sources used for the IHBG population data. For example, the Tribal Transportation Program provides funding based, in part, on the same Decennial Census AIAN data used for the IHBG program. Frequently Asked Questions on Tribal Population, U.S. Department of Treasury, https://home.treasury.gov/system/files/136/FAQ-on-Tribal-Population-Data.pdf, at 1 (June 4, 2020) (hereinafter, "FAQ Mem.").[6] Thus, there is precedent for Treasury's reliance on this data.

Third, Treasury concluded that data from other sources, including Tribal enrollment certifications, was unreliable. *See* Kowalski Decl. ¶¶ 6-7. As Plaintiff points out, Treasury did receive Tribal population certifications. *See* Kowalski Decl. ¶¶ 5-6. But there were a number of problems with these certifications. For example, certain Tribes submitted multiple certification forms, others

---

[6] Plaintiff claims that the FAQ contains "post hoc rationalizations." This is incorrect. The FAQ memorializes Treasury's justifications for adopting its methodology to begin with. *See* Kowalski Decl. ¶ 14. An agency may certainly explain, after the fact, why it chose to adopt a particular policy. *See Women Involved in Farm Econ. v. U.S. Dep't of Agric.*, 876 F.2d 994, 999 (D.C. Cir. 1989) ("[I]f an agency had no obligation to explain its actions contemporaneously . . . the entire record, or a good part of it, is actually created for the sole purpose of judicial review; by definition, much that is presented to the court is developed *post-hoc* . . . the explanation given to the court can be presented by those agency officials who directed the agency action.").

provided incomplete forms, and still others failed to respond altogether. *See* Kowalski Decl. ¶ 6. Additionally, Treasury found consistency issues with the enrollment data provided by Tribes, since different Tribes had different criteria for assessing whether someone was truly a Tribal member. *See* Kowalski Decl. ¶ 7. The IHBG data, by contrast, *is* consistent, and utilizes verifiable criteria— Decennial Census AIAN data for each formula area—to estimate each Tribe's enrollment. These justifications are adequate and render Treasury's determination "reasonable."

Additionally, to be sure, the Act does not *require* Treasury to look to Tribal population, or any other specific type of data. It states only that the Funds must generally be distributed based on "increased expenditures of each such Tribal government." 42 U.S.C. § 801(c)(7). Treasury refers to Tribal population data simply as a means to estimate a Tribe's relevant increased expenditures, which is inherently uncertain. Allocation Mem., at 1 ("By necessity . . . any allocation formula will yield only an estimate of increased eligible expenditures."). Thus, even a flawless Tribal enrollment count would still provide only a rough estimate of the amount of any given Tribe's increased COVID-related expenditures. Treasury's chosen methodology is not "arbitrary and capricious" simply because Plaintiff claims that Treasury could have picked a marginally less imperfect formula.

In response, Plaintiff simply nitpicks Treasury's methodology. But none of Plaintiff's criticisms render Treasury's disbursement methodology unreasonable. First, Plaintiff claims that the IHBG data does not reflect a Tribe's true population for a number of reasons. As a threshold matter, as noted above, Treasury acknowledges that IHBG data provides only an *estimate* of Tribal population, which in turn provides only an estimate a Tribe's anticipated increase in expenditures. This does not render Treasury's methodology unlawful. *See supra* at 11-13. Turning to Plaintiff's specific points:

- *IHBG data assigns twenty-five Tribes a population of zero.* Treasury's methodology addresses this scenario by guaranteeing Tribal governments a minimum payment of $100,000 if, under Treasury's disbursement methodology, they are found to have a population below thirty-seven. This is a sensible protective measure; indeed, it is telling that none of these twenty-five Tribes has joined this lawsuit. Recognizing and addressing

a potential issue is the height of reasoned decision-making.

- *IHBG data only counts the number of persons who racially identify as Indian within a given formula area.* It is not unreasonable for Treasury to conclude that most people who identify as Indian and live within a Tribe's territory are presumably members of that Tribe, and thus find that this data provides a useful population estimate. Aside from a few outliers, Plaintiff does not contend that there is significant divergence between this data and Tribal enrollment for most Tribes.

- *The IHBG population figures are capped at "twice a . . . Tribe's enrolled population."* It is unclear how this is an indictment of the IHBG data. If anything, this shows only that the IHBG formula reduces any discrepancy between its IHBG population data and the Tribes' enrollment numbers.

- *Certain Indian Tribes have little incentive to monitor and scrutinize IHBG data.* Even assuming this is true, the IHBG data is updated annually using the Census Bureau's Population Estimates Program. *See supra* at 5. And many Indian Tribes do have an incentive to scrutinize this data since it implicates, to some degree, the amount of housing assistance they receive. At minimum, it was still reasonable for Treasury to rely on this data.

- *IHBG population data does not include Tribal members that live outside of the Tribe's territory, even though the Tribe may provide them with assistance (e.g., health support).* Plaintiff, however, does not contend that a substantial number of Tribal members, for most Tribes, live outside of Tribal lands. Plaintiff provides no other data to suggest that exclusion of these persons in the IHBG population data will result in a significant undercounting for most Tribes. Additionally, Treasury reasonably concluded that Tribes primarily provide support to those members that do live on their territories.[7] Kowalski Decl. ¶ 9 ("Treasury . . . believed Tribal governments would be best positions to make necessary expenditures . . . for the area of a Tribal government's jurisdiction and where it provides services.").

- *The definition of "formula area" covers only nine categories of "property," and the formula areas were drawn in 2003.* The definition of formula area does include nine specifically enumerated property categories, but these categories are broad. They include, for example, "Reservations for federally recognized Indian tribes" and "Trust lands." 24 C.F.R. § 1000.302(1). Notably, Plaintiff does not allege that these categories exclude a substantial portion of Indian territory. Additionally, with respect to the time at which these formula areas were drawn, Plaintiff does not contend that there have been significant changes in Indian territorial boundaries since 2003. Regardless, the formula areas may be adjusted at any time following a petition by an Indian tribe. *See* 24 C.F.R. § 1000.302(2)(i).

---

[7] Plaintiff argues that Treasury treats "similarly situated people differently" since two Tribes with the same enrollment figures may have different IHBG population figures. *See* PI Mot. at 18. But this means only that Treasury's methodology may have different *effects* on certain Tribes that share certain similarities. The methodology itself does not treat Tribes differently—the population counts for all Tribes are calculated in the same manner under the IHBG formula.

14

Accordingly, Treasury reasonably relied on IHBG population data for an estimate of Tribal enrollment.

Second, Plaintiff claims that Treasury "ignored" allegedly superior data for Tribal population counts, such as Tribes' certified population enrollment figures. *See* PI Mot., at 19-20. But Treasury did not ignore other data sources; it concluded that, based on the relevant considerations, it would rely on the reliable pre-existing IHBG data. *See supra* at 12-13 (identifying flaws with other data sources); Kowalski Decl. ¶ 8 ("Treasury considered various alternative sources of population data for Indian Tribes."). "An agency typically has wide latitude in determining the extent of data-gathering necessary to solve a problem." [8] *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 754 (D.C. Cir. 2002) (internal quotation marks omitted); *see also Sierra Club v. U.S. E.P.A.*, 167 F.3d 658, 662 (D.C. Cir. 1999) (A court must "generally defer to an agency's decision to proceed on the basis of imperfect" data "rather than to invest the resources to conduct the perfect study.").

Third, Plaintiff claims that Treasury initially suggested that it would rely on Tribal enrollment certifications, and then "abandoned that approach." PI Mot., at 12. But Treasury never conclusively determined, in any regulation or otherwise binding document, that it would rely on Tribal enrollment certifications. *See* Kowalski Decl. ¶ 4 ("I participated in telephonic Tribal consultations with tribal leaders . . . I do not recall making any statement expressing a preference for any distribution based on population."). As noted in *supra* at 11-13, Treasury considered the relevant factors, and ultimately concluded it would rely on IHBG population data. In any event, "agencies may change their minds in the course of a rulemaking, even though those affected may be disappointed." *PSWF Corp. v. F.C.C.*, 108 F.3d 354, 357 (D.C. Cir. 1997).

---

[8] Plaintiff relatedly claims that the IHBG data infringes on Tribal sovereign authority to determine who may be a Tribal member. *See* PI Mot., at 15. The IHBG data, however, does not dictate who may be a member of any given Tribe. It is used here only to estimate the relevant Tribal population sizes.

c.  *Treasury complied with any procedural requirements in the CARES Act in adopting its methodology for disbursement of the Funds.*

Plaintiff claims that Treasury failed to observe the "procedure required by law" before adopting its disbursement methodology, in violation of 5 U.S.C. § 706(2)(D). This is patently false. The Act requires only that Treasury generally "consult[] with the Secretary of the Interior and Indian Tribes" as it constructs a methodology that it "determines appropriate." 42 U.S.C. § 801(c)(7). As Plaintiff concedes, Treasury participated in two "telephonic consultation sessions" with "representatives of Tribal governments across the United States." PI Mot., at 3. "Treasury also solicited written comments from Tribal governments regarding their views on potential methodologies for the allocation." *Id.* at 3-4. Indeed, Treasury generally guaranteed a $100,000 minimum payment for Tribes, in part, due to "the clear desire" for this provision "expressed by a substantial number of Indian Tribes during the Tribal consultation process." Allocation Mem., at 3. Thus, Treasury satisfied the relevant procedural requirement in the Act.

In response, Plaintiff analogizes the Act's consultation requirement with a "notice-and-comment" requirement, and essentially argues that the Plaintiff did not follow the requirements of notice-and-comment rulemaking.[9] But of course, the Act does not require notice-and-comment rulemaking. It requires only general consultation with Indian Tribes. In addition, it is well-accepted that notice-and-comment is not required when Congress establishes a narrow-time frame within which an agency must take action. *See*, *e.g.*, *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) ("[T]he extremely limited time given by Congress to the Secretary for adoption of the [relevant] regulations" relieved the agency of any notice-and-comment requirement, especially since notice-and-comment

---

[9] For example, Plaintiff cites to a body of case law indicating that, when notice-and-comment is required, a "final rule[] may "differ from the proposed rule" so long as the  "final rule is a 'logical outgrowth' of a proposed rule." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). Obviously, notice-and-comment is not required here, and thus this case law is inapplicable.

16

would be "impracticable."). Here, of course, the Act instructs Treasury to disburse the funds in a very short time-frame, and thus notice-and-comment would not be feasible, and is thus not required.

## II.     Plaintiff has not established any certain, irreparable harm.

Plaintiff cannot show that it would certainly receive additional compensation if Treasury adopted a different methodology. Even if Treasury were to use a different methodology, it would still be issuing payments from the same fixed sum of money. Thus, Plaintiff would only be entitled to additional funds if, under a new methodology, it would be entitled to a greater *pro rata* share of the funds vis-à-vis other Tribal governments. But this depends on the population counts assigned to other Tribes under a new methodology. If other Tribes are assigned greater population counts to a sufficient degree, Plaintiff could receive no additional payment, or a *de minimis* payment. An "[i]njury that is hypothetical or speculative does not rise to the level of irreparable harm." *Henke v. Dep't of the Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012).

## III.    The balance of equities and public interest disfavor Plaintiff's requested preliminary injunction.

The balance of equities strongly counsels against Plaintiff's request for emergency relief. Treasury has expended significant resources to disburse the Wave Two funds on Friday, June 12, 2020. Treasury's staff has devoted hours of work, including time spent over weekends, to meet this mark. *See* Kowalski Decl. ¶ 16. Plaintiff's requested relief would halt disbursement of Wave Two, and require Treasury to modify its methodology for Wave Two payments—undercutting a significant portion of Treasury's efforts over the last few weeks. *See Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011) (vacating a "preliminary injunction" that "would in fact upend the status quo" and impose a "hardship" on defendants). Plaintiff's requested relief is especially concerning since Plaintiff knew

of Treasury's methodology since May 5, 2020, and yet waited a month to file suit. [10] Plaintiff could

have (and should have) brought suit weeks ago, before Treasury continued to pour resources into

implementing its disbursement methodology. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987

(D.C. Cir. 1975) (The court's "conclusion that an injunction should not issue [was] bolstered by the

delay of the appellants in seeking one;" appellants waited 44 days to bring suit, which the court found

"inexcusable.").

Additionally, Plaintiff's requested relief undermines the public interest. Congress intended for

these funds to be disbursed appropriately and *promptly* to address current hardships posed by COVID-

19. A number of Indian tribes have even brought suit to *accelerate* Wave Two payments, alleging that

their "injuries are ongoing, worsening, and irreparable such that if the [Treasury] Secretary does not

immediately disburse the emergency relief funds," the plaintiffs "will be forced to curtail essential

governmental services and furlough or lay off a substantial number of employees."[11] Compl. ¶ 4, *Agua

Caliente Band of Cahuilla Indians v Mnuchin*, 20-cv-1136 (D.D.C. Apr. 30, 2020). Plaintiff's

requested relief would indefinitely delay the Wave Two payments. Plaintiff wants the court to enjoin

disbursement of these funds "until such time as a reasonable and more accurate allocation formula can

be created, *and vetted by Tribal governments*." Compl. ¶ 56 (emphasis added). This open-ended

consultation process could drag on for months, subjecting Tribes to even further delays in payment.

---

[10] Even if, as Plaintiff noted at the status hearing, Plaintiff reached out to the Treasury Department about this issue earlier, Plaintiff nonetheless could have (and should have) brought its suit earlier. Given the circumstances, Plaintiff was not justified in waiting for a response from the Treasury Department—which Plaintiff surely knew was occupied with CARES Act-related work—and then filing its suit at the Eleventh Hour. After all, Plaintiff was well aware that Treasury was already facing a lawsuit seeking to require it to disburse funds immediately, such that accepting Plaintiff's "offer" to avoid litigation would have put it in direct conflict with this Court's directives in that case.

[11] In *Agua Caliente*, Treasury denied that those plaintiffs had alleged imminent *irreparable* harm sufficient to justify a preliminary injunction, but Treasury did not deny that these funds were needed. Hr'g Tr., 30:19-31:14, *Agua Caliente Band of Cahuilla Indians v Mnuchin*, 20-cv-1136 (D.D.C. May 8, 2020). Toward that end, Treasury has worked diligently to allocate and make these payments as quickly as reasonably possible.

18

Further, Plaintiff's requested relief would harm other Tribes since any additional funds given to Plaintiff are funds that otherwise would have been distributed to other Tribes. Indeed, this creates an additional litigation risk. If, as Plaintiff hopes, a new methodology would enhance its pay-out, then presumably it would have to reduce what certain other Tribes receive; these Tribes would receive less than what they would have gotten under Treasury's current methodology. Surely these Tribes would take issue with the change, and may opt to file their own lawsuits challenging the new methodology.[12] All of this would further delay payments.

In its motion papers, Plaintiff suggests that Treasury need not "hold[] back all of the remaining" Wave Two funds, but rather could "issu[e] a portion of the funding and simply hold[] sufficient funds in reserve to re-allocate funds on an enrollment basis." PI Mot., at 26. But how would this work? Currently, Treasury does not know how much it allegedly "underpaid" Tribal governments based on the difference between IHBG population numbers, and actual Tribal enrollment, thus Treasury does not know how much of Wave Two would have to be "held back" for "re-allocat[ion] . . . on an enrollment basis." Thus, Treasury presumably would have to hold back all of the funds, and conduct its own review of the alleged underpayment, before it could disburse any of the funds. This further demonstrates that Plaintiff's last-minute rush for relief could result in a complex, lengthy process that leaves most Tribal governments worse off.

## **Conclusion**

The Court should deny Plaintiff's Motion for a Preliminary Injunction.

---

[12] In fact, two other Tribes have already reached out to Treasury's counsel to signal their intent to file amicus briefs in this matter, opposing Plaintiff's motion.

DATED: June 10, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ERIC WOMACK
Assistant Director, Federal Programs Branch

*/s/ Kuntal Cholera*
KUNTAL CHOLERA
JASON LYNCH
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L, NW Washington, DC 20005
Tel.: (202) 305-8645
Fax: (202) 616-8470
Email: kuntal.cholera@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all users receiving ECF notices for this case.

*/s/ Kuntal Cholera*

Kuntal V. Cholera
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005

Attorney for Defendants

21